# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 14, 2011          Decided April 13, 2012

No. 11-5033

BETH PETIT, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF EDUCATION AND ARNE
DUNCAN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
UNITED STATES DEPARTMENT OF EDUCATION,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01583)

*Mark W. Mosier* argued the cause for appellants. With him on the briefs were *S. William Livingston*, *Nishchay H. Maskay*, and *Emily Johnson Henn*.

*Seth M. Galanter* was on the brief for *amicus curiae* Council of Parent Attorneys and Advocates in support of appellants. *Brian R. Matsui* entered an appearance.

*Sarang Vijay Damle*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Ian Heath Gershengorn*, Deputy Assistant Attorney General, *Ronald C. Machen, Jr.*, U.S. Attorney, and *Michael S. Raab*, Attorney.

Before: HENDERSON and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

EDWARDS, *Senior Circuit Judge*: The Individuals with Disabilities Education Act ("the IDEA" or "the Act") provides federal grants to states to support educational programs for children with disabilities. In order to qualify for funding, participating states – and, by extension, local educational agencies ("school districts"), *see* 20 U.S.C. § 1413(a)(1) (2006) – must make a "free appropriate public education" available to every child with a disability, *id.* § 1412(a)(1). As defined by the IDEA, a "free appropriate public education" means "special education and related services." *Id.* § 1401(9). The statutory definition of "related services" is "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." *Id.* § 1401(26)(A). The IDEA separately requires school districts to provide necessary "assistive technology devices and services." *Id.* § 1414(d)(3)(B)(v); *see also id.* § 1401(1)–(2).

In 2004, Congress amended the IDEA. The amended Act provides, *inter alia*, that "related services" and "assistive technology device[s]" do "not include a medical device that is surgically implanted, or the replacement of such device." *Id*. § 1401(26)(B), (1)(B). Moreover, under the amended Act, a school district is required to provide assistive technology services only for devices falling within the Act's definition of "assistive technology device." *Id*. § 1401(2). This means that states are not responsible for "selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing, or

replacing" surgically implanted medical devices. *Id.* § 1401(2)(C). The statutory definition of "related services," however, does not explicitly address whether states must generally provide optimization and maintenance services for surgically implanted medical devices. *See id*. § 1401(26)(B).

Appellants are parents of children who are eligible to receive a free appropriate public education under the IDEA. Their children use cochlear implants – a device used by individuals with severe hearing disabilities. These devices are surgically implanted, and they include both internal and external components. To function properly, a cochlear implant must be routinely optimized – a process known as "mapping." The Department of Education ("the Department" or "the Secretary") promulgated regulations in 2006, which state that, given the new statutory definition of "assistive technology device," school districts are not required to provide the mapping of cochlear implants as an "assistive technology service." Appellants do not challenge the exclusion of mapping as an assistive technology service. The 2006 regulations also state that school districts are not required to provide mapping as a "related service." *See* 34 C.F.R. § 300.34(b)(1), 300.113(b)(2) (2011) ("the Mapping Regulations" or "the Regulations"). In particular, the regulatory definition of "related services" excludes "a medical device that is surgically implanted, the optimization of that device's functioning (e.g., mapping), maintenance of that device, [and] the replacement of that device." *Id.* § 300.34. After the Department issued the final regulations, the school districts in which Appellants reside stopped providing mapping to Appellants' children.

Appellants filed the instant suit to challenge the exclusion of mapping from the regulatory definition of "related services." They advance two claims. First, Appellants argue that the Regulations are founded on an impermissible construction of the IDEA, insofar as they define related services to exclude the

mapping of cochlear implants. Second, Appellants point to 20 U.S.C. § 1406(b)(2), which provides that "[t]he Secretary may not implement . . . any regulation . . . that . . . substantively lessens the protections provided to children with disabilities under . . . [the] regulations in effect on July 20, 1983 (particularly as such protections related to . . . related services . . .), except to the extent that such regulation reflects the clear and unequivocal intent of Congress in legislation." According to Appellants, because the Department's 1983 regulations provided for audiology services and audiology services included mapping, the 2006 Mapping Regulations violate the IDEA. The District Court rejected Appellants' claims and granted summary judgment to the Department. *See Petit v. U.S. Dep't of Educ.*, 756 F. Supp. 2d 11 (D.D.C. 2010); *Petit v. U.S. Dep't of Educ.*, 578 F. Supp. 2d 145 (D.D.C. 2008). Appellants now appeal.

We conclude that the phrase "audiology services" as used in the IDEA's "related services" definition, 20 U.S.C. § 1401(26)(A), does not unambiguously encompass mapping of cochlear implants. We also find that the Mapping Regulations embody a permissible construction of the Act, because they are rationally related to the underlying objectives of the IDEA. We additionally find that the Mapping Regulations do not, in contravention of the IDEA, substantively lessen the protections afforded by the 1983 regulations. "Audiology services," as used in the Department's 1983 regulations had no more of a fixed meaning than the term has now, as used in the IDEA itself. And the Department has interpreted the 1983 regulations not to encompass mapping. Because the Department's construction of its own regulation is neither plainly erroneous nor inconsistent with the regulation, we owe it deference. We are therefore constrained to deny Appellants' claims and affirm the District Court's grant of summary judgment to the Department.

## I. Background

## A. The IDEA and Cochlear Implants

### 1. *The IDEA*

"Congress enacted IDEA in 1970 to ensure that all children with disabilities are provided a free appropriate public education . . . designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected." *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2491 (2009) (second and third alterations in original) (footnote omitted) (citation omitted) (internal quotation marks omitted). The cornerstone of the Act is the condition that schools provide children with a "free appropriate public education." *See* 20 U.S.C. §§ 1412(a)(1)(A), 1413(a)(1). A free appropriate public education must be tailored to each child's needs pursuant to an "individualized education program" ("IEP") designed by the child's "IEP Team." *Id.* §§ 1401(14), 1414(d).

The Act defines "free appropriate public education" to mean "special education and related services." *Id.* § 1401(9). However, in *Board of Education of the Hendrick Hudson Central School District, Westchester County v. Rowley*, 458 U.S. 176 (1982), the Supreme Court refused to interpret the phrase to require schools to "maximize the potential of handicapped children 'commensurate with the opportunity provided to other children,'" *id.* at 189–90 (citation omitted). Instead, the Court interpreted the Act to require schools to provide a "'basic floor of opportunity.'" *Id.* at 200 (quoting H.R. REP. No. 94-332, at 14 (1975)). A school satisfies the requirement of a free appropriate public education "by providing personalized instruction with sufficient support services to permit [a] child to benefit educationally from that instruction." *Id.* at 203.

The "special education" component of "free appropriate public education" is not directly at issue in this case. The

"related services" component, however, is of critical importance. For each child with a disability, the IEP Team is responsible for determining which related services must be made available by the school district. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(IV). All such services must be specified in a child's written IEP. *Id.*

"Related services" under the IDEA include, *inter alia*, "transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, [and] counseling services . . .) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." *Id.* § 1401(26)(A). In 2004, Congress amended this definition by adding an express "exception." *See* Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 602(26), 118 Stat. 2647, 2657 (codified at 20 U.S.C. § 1401(26)(B)). The exception states that the term "related services" excludes "a medical device that is surgically implanted, [and] the replacement of such device." 20 U.S.C. § 1401(26)(B).

The Supreme Court first addressed the meaning of "related services" in *Irving Independent School District v. Tatro*, 468 U.S. 883 (1984). There, the Court interpreted the phrase to include "services that enable the child to reach, enter, or exit the school" as well as "[s]ervices . . . that permit a child to remain at school during the day." *Id.* at 891. The Court reaffirmed that interpretation in *Cedar Rapids Community School District v. Garret F. See* 526 U.S. 66, 73 (1999) ("As a general matter, services that enable a disabled child to remain in school during

the day provide the student with 'the meaningful access to education that Congress envisioned.'" (citation omitted)). The Court has yet to address the meaning of the "exception" for surgically implanted medical devices that was added to the IDEA in 2004.

In addition to "related services," the Act also directs each child's IEP team to "consider whether the child needs assistive technology devices and services." 20 U.S.C. § 1414(d)(3)(B)(v). "The term 'assistive technology device' means any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve functional capabilities of a child with a disability." *Id.* § 1401(1)(A). Pursuant to the 2004 amendments, this definition excludes "a medical device that is surgically implanted, [and] the replacement of such device." *Id.* § 1401(1)(B). "The term 'assistive technology service' means any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device . . . [including] selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing, or replacing assistive technology devices . . . ." *Id.* § 1401(2)(C).

The Department has consistently maintained that, as a general matter, the IDEA does not require a school district to provide "a personal device that [a] student would require regardless of whether he/she was attending school." Letter from Thomas Hehir, Dir. Office of Special Educ. Programs, to Peter J. Seiler, Superintendent, Ill. Sch. for the Deaf 1 (Nov. 19, 1993) ("Seiler Letter"), *reprinted in* Joint App. ("J.A.") 8. For example, the Department generally does not require school districts to provide hearing aids or eyeglasses as assistive technology devices. *Id.*; *see also* Letter from Thomas Hehir to Terry K. Bachus, Dir. Dep't of Special Educ., Wichita Pub. Sch. 2 (Jan. 13, 1995) ("Bachus Letter"), J.A. 13. But the

Department does require school districts to provide personal devices if they are specified in a child's IEP as necessary for him or her to receive a free appropriate public education. *See* Bachus Letter 2, J.A. 13; Seiler Letter 1, J.A. 8.

2. *Cochlear Implants*

As Appellants explain, a cochlear implant is a type of hearing aid for an individual whose hearing loss is too severe for the use of a traditional acoustical hearing aid. The device consists of both an external component and a surgically implanted internal component. The external component – a microphone, a speech processor, and a transmitter system – detects and processes sound and then transmits the sound to the internal component in the form of radio waves. The internal component – a receiver connected to an electrode array – receives the radio waves and stimulates the corresponding electrodes so that the brain can process the audio signals.

A cochlear implant periodically must be mapped to function properly. Mapping is the process by which an audiologist optimizes the amount of stimulation that the electrodes provide to the auditory nerve. According to Appellants, an audiologist maps an implant by measuring the user's response to electrical stimulation by connecting the device's speech processor to a computer with specialized software. Based on the user's response to the stimuli, the audiologist calibrates the speech processor so that the electrodes stimulate the auditory nerve in a way that the user can process. Periodic mapping is essential, because, without it, the cochlear implant may transmit auditory information to the brain that does not accurately reflect the sounds around the user.

Mapping must be performed by an audiology specialist who possesses a specific set of skills. *See* Letter from Am. Acad. of Audiology to Troy R. Justesen, U.S. Dep't of Educ. (Aug. 12, 2005) ("Academy Letter"), J.A. 43. Moreover, the audiologist

must have familiarity with the "speech coding, processing and programming parameters of all . . . manufacturers of cochlear implants." *Id.*, J.A. 44. Thus, the American Academy of Audiology requires that, even to sit for the examination for Board Certification in Audiology with Speciality in Cochlear Implants, an audiologist must have "two years experience as an audiologist, 450 hours of direct contact with individuals with cochlear implants, and 50 hours of case management of individuals with [cochlear implants]." *Id.*, J.A. 43.

Marilyn Neault, the Director of Habilitative Audiology at the Children's Hospital in Boston, has explained why mapping must be performed by a specialist:

> Programming (mapping) of a cochlear implant processor alters the electrical stimulation that the implant provides to the surrounding tissue inside the inner ear. Too much stimulation can cause pain or facial twitching. Programming that is poorly done can result in a lower outcome in terms of the child's ability to hear. Failure of the programming audiologist to notice changes in the child's electrical stimulation requirements that signal partial extrusion or malfunction of the internal device can result in poor outcome. Failure of the audiologist to notice that the headpiece magnet is too tight can result in skin breakdown over the magnet which can require hospitalization and surgery. Lack of communication access between the programming audiologist and the implant surgeon can delay action regarding internal device problems.

Letter from Marilyn W. Neault to Troy R. Justesen 1 (Sept. 6, 2005) ("Neault Letter"), J.A. 48.

**B.  Regulatory and Procedural History**

1.  *The Mapping Regulations*

The Department is authorized to "issue regulations under [the IDEA] . . . [as] are necessary to ensure . . . compliance" with the Act's requirements.  20 U.S.C. § 1406(a).  In late 2004, the Department solicited comments and recommendations regarding the recently enacted amendments to the IDEA.  *See* Department of Education, Individuals with Disabilities Education Act, Notice of Request for Comments and Recommendations, 69 Fed. Reg. 77,968 (Dec. 29, 2004).  Among the thousands of comments that the Department received were many requests from state officials seeking clarification as to the status of cochlear implant mapping under the amended IDEA.  *See* Department of Education, Assistance to States for the Education of Children with Disabilities, Notice of Proposed Rulemaking, 70 Fed. Reg. 35,782, 35,783, 35,785 (June 21, 2005).

Prior to the 2004 amendments, some courts had construed the Act and the Department's regulations to require school districts to offer cochlear implant mapping to children pursuant to their IEPs.  *See, e.g.*, *A.U., ex rel. N.U. v. Roane Cnty. Bd. of Educ.*, 501 F. Supp. 2d 1134, 1143–44 (E.D. Tenn. 2007); *Stratham Sch. Dist. v. Beth P.*, No. 02-135, 2003 WL 260728 (D.N.H. Feb. 5, 2003).  The 2004 amendments to the IDEA clearly resolved that school districts are not required to provide or replace cochlear implant devices as either a related service or an assistive technology device.  *See* 20 U.S.C. § 1401(1)(B), (26)(B).  Furthermore, commenters to the Department's request for recommendations appeared to surmise correctly that school districts were no longer required to offer mapping as an assistive technology service, given the amended statutory definition of "assistive technology device."  *See, e.g.*, Letter from Linda McCulloch, Mont. Superintendent, to Troy R. Justesen (Feb. 24, 2005) ("McCulloch Letter"), J.A. 25.    But commenters

expressed uncertainty as to whether school districts could be required to offer mapping as a related service. *See, e.g.*, Letter from Cecil J. Picard, La. Superintendent of Educ., to John H. Hager, Assistant Sec'y (Feb. 25, 2005), J.A. 22–23; Letter from Alice D. Parker, Cali. Dep't of Educ., to Troy Justesen (Feb. 9, 2005), J.A. 19–20.

In response to these concerns, the Department ultimately amended the regulatory definition of "related services" to exclude "a medical device that is surgically implanted, the optimization of that device's functioning (e.g., mapping), maintenance of that device, [and] the replacement of that device." Department of Education, Assistance to States for the Education of Children with Disabilities, Final Regulations ("Final Regulations"), 71 Fed. Reg. 46,540, 46,760 (Aug. 14, 2006) (codified at 34 C.F.R. § 300.34(b)(1) (2011)). At the urging of several commenters, however, the Department clarified that school districts are still required to provide *some* services to students with cochlear implants. The Department explained that nothing in its new regulation –

> (i) Limits the right of a child with a surgically implanted device (e.g., cochlear implant) to receive [general] related services . . . that are determined by the IEP Team to be necessary for the child to receive [a free appropriate public education].
>
> (ii) Limits the responsibility of a public agency to appropriately monitor and maintain medical devices that are needed to maintain the health and safety of the child, including breathing, nutrition, or operation of other bodily functions, while the child is transported to and from school or is at school; or
>
> (iii) Prevents the routine checking of an external component of a surgically implanted device to make sure it is functioning properly, as required in § 300.113(b).

*Id.* (codified at 34 C.F.R. § 300.34(b)(2) (2011)).

The Department also adopted a new regulatory provision clarifying school districts' obligations with respect to the "[r]outine checking of . . . external components of surgically implanted medical devices." *Id.* at 46,764 (codified at 34 C.F.R. § 300.113 (2011)). Section 300.113(b) of this provision states that

(1) Subject to paragraph (b)(2) of this section, each public agency must ensure that the external components of surgically implanted medical devices are functioning properly.

(2) For a child with a surgically implanted medical device who is receiving special education and related services under this part, a public agency is not responsible for the post-surgical maintenance, programming, or replacement of the medical device that has been surgically implanted (or of an external component of the surgically implanted medical device).

*Id.*

### 2. *Prior Litigation and the Proceedings Below*

Appellants Beth and David Petit are the parents of H.P., who was born in 1996 with severe hearing loss in both ears. H.P. was initially fitted with acoustical hearing aids, but it quickly became apparent that he was not receiving any benefit from them due to the extent of his hearing loss. In 1999, H.P. was fitted with a cochlear implant, and he began to meet with audiologists for mapping sessions. In that same year, the school district identified H.P. as eligible for special education and related services under the IDEA. In 2000 and 2001, Mrs. Petit sought reimbursement from the school district for their copays for H.P.'s mapping sessions as well as the transportation costs associated with those sessions. The school district initially

refused to provide reimbursement. However, the school district was required to change its position after the District Court for New Hampshire ruled that mapping qualified as a related service for H.P. *See Beth P.*, 2003 WL 260728, at \*4–5. The school district thereafter continued to cover H.P.'s mapping costs, until the Department's new Mapping Regulations took effect.

Appellants Nicole and Bennie Underwood are the parents of A.U., who was also born with severe hearing loss in both ears. She was fitted with a cochlear implant in her right ear in 2002 and in her left ear in 2005. The school district in which the Underwood family resides initially covered the costs of mapping as a related service, but then declined coverage after the Department proposed its new regulations. The District Court for the Eastern District of Tennessee required the school district to pay for A.U.'s mapping through the date on which the Department's regulation actually took effect. *See A.U., ex rel. N.U.*, 501 F. Supp. 2d. at 1143–44. The school district complied with the court's order, but no longer covers A.U.'s mapping sessions.

Appellants filed this suit seeking declaratory judgment and injunctive relief against the Mapping Regulations as well as reasonable attorneys' fees. They advanced two claims. First, they claimed that the Regulations violate the IDEA. As noted above, the Department "may not implement, or publish in final form, any regulation prescribed pursuant to this chapter that . . . substantively lessens the protections provided to children with disabilities under this chapter, as embodied in regulations in effect on July 20, 1983." 20 U.S.C. § 1406(b). Appellants claimed the Mapping Regulations violate this restriction, because the 1983 regulations provided for "audiology services" – a term that, Appellants argued, encompasses mapping. Second, Appellants claimed that under the Administrative Procedure Act ("the APA"), 5 U.S.C. § 706 (2006), the Mapping Regulations "are contrary to the plain

language, intent, and purpose of IDEA." Compl. ¶ 52, J.A. 371. Moreover, Appellants contended that "the regulations exceed the Secretary's statutory rulemaking authority under 20 U.S.C. § 1406 and do not reasonably interpret the statute." *Id.* In effect, Appellants argued that the IDEA itself, quite apart from the 1983 regulations, covers mapping.

In separate memorandum opinions, the District Court granted summary judgment to the Department. First, the District Court addressed Appellants' APA claims. Following the two-step framework from *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the District Court determined that the text of the IDEA is ambiguous as to whether mapping is a related service, *see Petit*, 578 F. Supp. 2d at 154–59. Taking a contextual approach to the IDEA, the District Court concluded that the fact that the "medical device exception is situated within the definition of related *services* . . . creates ambiguity as to whether the medical device exception applies to services related to those devices (*i.e.*, mapping)." *Id.* at 157 (citation omitted). The District Court then concluded that, at *Chevron* step two, the Mapping Regulations were permissible, based on, *inter alia*, the Department's determinations that mapping need not be offered at school for a child to benefit and that mapping must be provided by highly skilled experts. *See id.* at 159–60.

The District Court then addressed and rejected Appellants' claim that the Mapping Regulations substantively lessen the protections afforded by the 1983 regulations. *See Petit*, 756 F. Supp. 2d at 18. The court recognized that the 1983 regulations provided for "audiology services." *See id.* at 15. However, the District Court concluded that this did not conclusively indicate that the 1983 regulations encompassed mapping. The District Court thus deferred to the Department's interpretation of the 1983 regulation, finding that the interpretation was not plainly erroneous or inconsistent with the regulation. *See id.* at 16–18.

Appellants appeal both orders.

## II. Analysis

### A. Standard of Review

In a case of this sort, in which the District Court has reviewed an agency action under the APA, "we review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002) (citations omitted); *see also Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997). Upon our review of the record, we will uphold the Department's action, unless we find it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *id.* § 706(2)(C).

In assessing the Department's interpretation of the IDEA, we remain mindful that

> an agency's power to regulate "is limited to the scope of the authority Congress has delegated to it." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005). Pursuant to *Chevron* Step One, if the intent of Congress is clear, the reviewing court must give effect to that unambiguously expressed intent. If Congress has not directly addressed the precise question at issue, the reviewing court proceeds to *Chevron* Step Two. Under Step Two, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are . . . manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44. Where a "legislative delegation to an agency on a particular question is implicit rather than explicit," the reviewing court must uphold any "reasonable interpretation

made by the administrator of [that] agency." *Id.* at 844. But deference to an agency's interpretation of its enabling statute "is due only when the agency acts pursuant to delegated authority." *Am. Library Ass'n*, 406 F.3d at 699.

HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW – REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 141 (2007) (alterations in original).

Our review of the Department's construction of its regulations

> is governed by 5 U.S.C. § 706(2)(A), which requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Pursuant to this standard, a court accords "substantial deference" to an agency's views. *See, e.g.*, *Allentown Mack*, 522 U.S. at 377; *Thomas Jefferson Univ.*, 512 U.S. at 512. Thus, an agency interpretation that "does not violate the Constitution or a federal statute . . . must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 45 (1993). "In other words," deference to an agency's interpretation of its regulation is required "unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.*, 512 U.S. at 512. The substantial deference due agency interpretations of ambiguous regulations is "all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the

exercise of judgment grounded in policy concerns." *Id.*

*Id*. at 163 (alterations in original).

### B. The "Mapping" of Cochlear Implants Is Not Required by Section 300.113 of the Department's 2006 Regulations

During oral argument before this court, Appellants' counsel suggested that mapping of cochlear implants was encompassed by Section 300.113 of the 2006 regulations. This provision states that school districts are responsible for the "[r]outine checking of hearing aids and external components of surgically implanted medical devices." Final Regulations, 71 Fed. Reg. at 46,764 (codified at 34 C.F.R. § 300.113 (2011)). Appellants' claim resting on Section 300.113 was never raised with the agency or the District Court, nor was it raised by Appellants in their brief to this court. It is therefore waived. *See Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 38 (D.C. Cir. 2009) (per curiam) (holding that petitioners waived two statutory arguments by failing to raise them in opening briefs); *World Wide Minerals, Ltd. v. Republic of Kaz.*, 296 F.3d 1154, 1160 (D.C. Cir. 2002) ("As we have said many times before, a party waives its right to challenge a ruling of the district court if it fails to make that challenge in its opening brief." (citations omitted)).

To avoid any confusion on this point, however, we should make it clear that, even if this argument was obliquely raised by Appellants, any claim resting on Section 300.113 is wholly without merit. Mapping necessarily falls outside of Section 300.113, because this regulatory provision covers only the routine checking of *external* components. Mapping, as we understand it, is designed to target the *internal* component of the implant. At oral argument, there was some confusion over whether mapping primarily affects the external or internal component. Appellants' theory of this case, however, has never

included a claim that mapping is equivalent to manipulating or replacing an external component such as a battery. This is hardly surprising, because the record indicates that mapping refers to the process by which the internal component of the implant is calibrated. *See* Neault Letter 1, J.A. 48 ("Programming (mapping) of a cochlear implant processor alters the electrical stimulation that the implant provides to the surrounding tissue *inside the inner ear*." (emphasis added)).

Even if mapping has an impact on the external component of the implant, it still would not be covered by Section 300.113. Paragraph (b)(1) of this provision says that "[*s*]*ubject to paragraph (b)(2)* . . . each public agency must ensure that the external components of surgically implanted medical devices are functioning properly." Final Regulations, 71 Fed. Reg. at 46,764 (emphasis added) (codified at 34 C.F.R. § 300.113(b)(1) (2011)). Paragraph (b)(2), in turn, states:

> For a child with a surgically implanted medical device who is receiving special education and related services under this part, a public agency is not responsible for the post-surgical maintenance, programming, or replacement of the medical device that has been surgically implanted (*or of an external component* of the surgically implanted medical device).

*Id.* (emphasis added) (codified at 34 C.F.R. § 300.113(b)(2) (2011)).

The record makes absolutely clear that mapping falls within the ambit of "post-surgical maintenance [or] programming" under paragraph (b)(2). *See* Final Regulations, 71 Fed. Reg. at 46,569 ("Specifically, 'mapping' and 'optimization' refer to adjusting the electrical stimulation levels provided by the cochlear implant that is necessary for long-term post-surgical follow-up of a cochlear implant."); *see also* Letter from Marilyn W. Neault to Senator Judd Gregg (Apr. 3, 2003) ("Gregg

Letter"), J.A. 15–16 (describing mapping as "optimizing the programming of electrical stimulation levels in [an] implanted device[]"); McCulloch Letter, J.A. 26 ("'Mapping,' or programming of the Cochlear Implant to deliver an amount and type of electrical stimulation appropriate for the user, is a complex *device maintenance procedure . . . .*").

Finally, and most significantly, the Department has been perfectly clear throughout this case in stating that "mapping a cochlear implant (or paying the costs associated with mapping) is not routine checking . . . and should not be the responsibility of a public agency." Final Regulations, 71 Fed. Reg. at 46,582. There has been no dispute on this point. As both parties assumed prior to oral argument, the Regulations categorically excuse school districts from providing mapping as a related service. Section 300.113 is perfectly consistent with this position. Our task is to determine whether the Mapping Regulations are valid.

## C. The Department's Mapping Regulations Are Not Contrary to the Plain Language of the IDEA

Appellants' principal claim in this case is that "[t]he Mapping Regulations are invalid because they are contrary to the plain language of the IDEA." Appellants' Br. at 16. This is a *Chevron* step-one claim, so we must determine whether the IDEA unambiguously requires school districts to provide for the mapping of cochlear implants as a "related service." This is a close question.

The parties do not dispute that "audiology services" are related services. The question is whether, under the IDEA, the term "audiology services" unambiguously encompasses mapping of cochlear implants. The relevant provisions of the statute read as follows:

(26) Related services

(A) In general

The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

(B) Exception

The term does not include a medical device that is surgically implanted, or the replacement of such device.

20 U.S.C. § 1401(26). As can be seen from this language, the term "audiology services" is listed but not defined in subsection (A). And subsection (B) makes it clear that "a medical device that is surgically implanted, or the replacement of such device" is excluded from the definition of "related services." In other words, neither subsection (A) nor (B) gives a clear indication as to whether mapping is a related service. Appellants' best argument is that the term "audiology services" so clearly embraces mapping that there is nothing more to ponder.

It is true that "the absence of a statutory definition does not render a word ambiguous." *Natural Res. Def. Council v. EPA*,

489 F.3d 1364, 1373 (D.C. Cir. 2007) (citation omitted). In the absence of an express definition, we must give a term its ordinary meaning. *See FCC v. AT&T, Inc.*, 131 S. Ct. 1177, 1182 (2011) (citation omitted). And the ordinary meaning of "audiology" is "[t]he study of hearing disorders through the identification and measurement of hearing impairment as well as the rehabilitation of persons with hearing impairments." STEDMAN'S MEDICAL DICTIONARY 169 (27th ed. 2000); *see also* Appellants' Br. at 23 (providing additional definitions). At first blush, this definition seems to encompass mapping. Indeed, even the Department does not appear to contest that mapping qualifies as an audiology service under standard medical definitions of "audiology services."

In the final analysis, however, we nonetheless think that Appellants have fallen short of demonstrating that "audiology services," *as used in the IDEA*, unambiguously encompasses mapping. "[T]o prevail under *Chevron* step one, [Appellants] must do more than offer a reasonable or, even the best, interpretation" of the IDEA. *Village of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011). Instead, they "must show that the statute *unambiguously* forecloses the [agency's] interpretation." *Id.* (citation omitted). Put another way, they must demonstrate that the challenged term is susceptible of "'only [one] possible interpretation.'" *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1015 (D.C. Cir. 1999) (quoting *Sullivan v. Everhart*, 494 U.S. 83, 89 (1990)).

Moreover, at step one, a court must "exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue. The traditional tools include examination of the statute's text, legislative history, and structure, as well as its purpose." *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (citations omitted) (internal quotation marks omitted); *see also Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (confirming that we may

look to the "text, structure, purpose, and history" of an agency's authorizing statute to determine whether a statutory provision admits of congressional intent on the precise question at issue).

Appellants are correct that we must start with the statute's text. *See, e.g.*, *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (citations omitted). But the meaning we ascribe to statutory text must reflect the statute's "context." *Bell Atl. Tel. Cos.*, 131 F.3d at 1047. For, as this court has explained, "[t]he literal language of a provision taken out of context cannot provide conclusive proof of congressional intent, any more than a word can have meaning without context to illuminate its use." *Id.*; *see also PDK Labs., Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 794 n.1 (D.C. Cir. 2004) ("[O]ne cannot understand a statute merely by understanding the words in it."); *Cnty. of L.A.*, 192 F.3d at 1014 ("[T]o prevent statutory interpretation from degenerating into an exercise in solipsism, 'we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law.' . . . '[W]e consider not only the language of the particular statutory provision under scrutiny, but also the structure and context of the statutory scheme of which it is a part.'" (citations omitted)). Thus, in interpreting "audiology services," we must consider not only the ordinary meaning of this term, but also, among other things, "the problem Congress sought to solve" in enacting the statute in the first place. *PDK Labs., Inc.*, 362 F.3d at 796.

The Department urges that, following such a contextual approach, this court should conclude that the 2004 amendments to the IDEA's "assistive technology" provisions rendered the "related services" provision ambiguous with respect to mapping. No one disputes that these amendments exempted school districts from providing mapping as an assistive technology service; the Department argues that "it is doubtful" Congress would do so "while simultaneously and *sub silentio* mandating

the provision of such services via the 'related services' provisions." Appellees' Br. at 25. This reasoning is superficially attractive, but ultimately unpersuasive. First, the Department did not advance this position before the District Court, so the claim is forfeited. *See District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." (citations omitted)). Second, even if the argument is implicit in the Department's theory of the case, as the agency now seems to suggest, it nonetheless lacks merit. After the 2004 amendments, mapping could unambiguously qualify as a related service but not as an assistive technology service. The mere existence within a statute of two terms with overlapping but distinct definitions does not necessarily render either provision ambiguous.

We also are not persuaded by the District Court's approach to interpreting the "related services" provision. The District Court held that the placement of the medical devices exclusion within the "related services" provision created ambiguity as to whether the exclusion reached mapping. *See Petit*, 578 F. Supp. 2d at 157. Even the Department does not defend this analysis on appeal. The fact that Congress expressly did not intend for schools to provide surgically implanted medical devices as a related service says nothing with respect to whether Congress intended schools to provide the programming and maintenance of those devices as a related service.

In the end, however, we conclude that "audiology services" as used in the IDEA is ambiguous. In reaching this conclusion, we start with the Act's explicit educational purpose. The IDEA requires school districts to provide related services, such as audiology services, not *qua* related services, but, along with special education, as instrumental means to ensure that children with disabilities receive a "free appropriate public

education . . . designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also id.* § 1401(9) (defining "free appropriate public education" to mean "special education and related services"). Furthermore, the "related services" provision makes clear that school districts are required to provide "developmental, corrective, and other supportive services" – the categories of services that parenthetically include "audiology services," *see id.* § 1401(26)(A) – only "as may be required to assist a child with a disability to benefit from special education," *id.* In other words, the services must be *related* to something – *i.e.*, special instruction and the IDEA's standard of a free appropriate public education. That standard is limited.

Based on the structure and purpose of the IDEA, the Supreme Court has refused to interpret "free appropriate public education" "to require . . . the furnishing of every special service necessary to maximize each handicapped child's potential." *Rowley*, 458 U.S. at 199. Such an expansive interpretation would push the IDEA "further than Congress intended to go." *Id.* Instead, the Court has interpreted the phrase to guarantee children with disabilities only a "'basic floor of opportunity.'" *Id.* at 200 (citation omitted).

Thus, we think the meaning of "audiology services" as used in the IDEA's "related services" provision is ambiguous as to whether it encompasses the full panoply of services that might be described as audiology services in other contexts. *Cf. Garret F.*, 526 U.S. at 74–75 ("It is thus settled that the phrase 'medical services' in § 1401(a)(17) [of the IDEA] does not embrace all forms of care that might loosely be described as 'medical' in other contexts, such as a claim for an income tax deduction."). The term might instead refer to those services provided by educational audiologists – services that do not typically include mapping. *See* Gregg Letter, J.A. 15 (distinguishing mapping from educational audiology services such as the "provision of

proper classroom acoustical modifications, speech and language therapy, FM educational amplification systems, educational support services such as pre-teaching and post-teaching the class lessons, and even replacing batteries and detecting malfunctions of the externally worn cochlear implant speech processor"); McCulloch Letter, J.A. 26; *see also* EDUC. AUDIOLOGY ASS'N, SCHOOL-BASED AUDIOLOGY SERVICES (2009), *available at* http://www.edaud.org/associations/4846/files/AdvocacyState ment_1_core.pdf.

There are two considerations that amplify our conclusion that "audiology services" as used in the IDEA is ambiguous.

*First*, Appellants point out that the "audiology services" component of the "related services" provision contains "no words of limitation." *PDK Labs., Inc.*, 362 F.3d at 800 (Roberts, J., concurring in part and concurring in the judgment). Therefore, according to Appellants, absent an express limitation, a general term usually encompasses everything within its standard definition. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 592 (D.C. Cir. 2004) ("[A]n agency cannot, absent strong structural or contextual evidence, exclude from coverage certain items that clearly fall within the plain meaning of a statutory term."). To reinforce this point, Appellants point out that the "medical services" component of the "related services" provision does contain an express limitation; school districts must provide only those medical services that are "for diagnostic and evaluation purposes." 20 U.S.C. § 1401(26)(A).

Appellants also argue that the "nurse services" component of the "related services" provision could be interpreted to contain an express educational limit. That component in full covers "school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child." *Id*. There are two bases for concluding that this component contains an express educational limit. The word "school" could

modify the phrase "nurse services." And the additional phrase "designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child" is unique to "nurse services"; it does not modify other services contained within the "related services" provision.

Appellants thus urge that, because the "medical services" and "nurse services" components of the "related services" provision contain express limitations, we should hesitate to find an implied educational limit on "audiology services." This claim would be compelling were it not shortsighted.

An educational limit is not implied. It is imposed by the statute's context. For example, "transportation" is also listed as a related service. *Id.* The phrase is not expressly limited in any way. Surely, however, no plaintiff could argue that the IDEA unambiguously requires the relevant school district to provide his or her child with the best and most comfortable form of transportation to and from a specific school. Similarly, "psychological services" is listed as a related service, and it too is unqualified and unmodified. *Id.* But it seems to be at least ambiguous whether schools could ever be required to provide the *full range* of psychological services to children with disabilities, given the breadth of services available. One need only peruse the volumes of the *Psychological Review* and other materials published by the American Psychological Association to grasp this point.

Additionally, we think it more natural to read the "nurse services" component not to contain an express educational limit. The reference is not a model of clarity, but we think that Appellants attach too much significance to the word "school" in conjunction with "nurse services." Appellants appear to view the word "school" as an independent adjective that modifies "nurse services." In other words, Appellants read the phrase as "school nurse[-]services" and attach a limiting function to the

word "school." This reading would be more plausible if the IDEA used different language, such as "educational nurse services." But school nurses are ubiquitous in public schools. We think it more likely that Congress employed "school nurse" as a compound adjective that modifies "services." Therefore, we read the phrase as "school[-]nurse services" and attach a descriptive function to the phrase "school nurse."

Nor does our reading of this component change, merely because the component contains the additional phrase "designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child." *Id.* It might seem odd that Congress specifically attached this phrase to "nurse services" but not to other related services. We think not, however. We do not infer that Congress included this phrase to impose an educational limit on "nurse services." Instead, we interpret the phrase to signal Congress's intent that a school must do more than simply provide standard school nurse services to satisfy the IDEA; a school must also provide such nontraditional school nurse services as are required by the IDEA and included in a child's IEP.

*Second*, we understand that the Supreme Court has consistently warned against looking to a statute's "statement of findings [or] purpose . . . in the context of an unambiguous statutory text." *E.g.*, *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211–12 (1998). After all, "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Id.* at 212 (citation omitted) (internal quotation marks omitted). Similarly, the Court has explained that the "title" and "headings" of a statute are "of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain." *Bhd. of R.R. Trainmen v. Balt. & Ohio*

*R.R. Co.*, 331 U.S. 519, 528–29 (1947). But these warnings are inapposite here. Unlike the statutes at issue in *Yeskey* and *Brotherhood of Railroad Trainmen*, the IDEA does not expressly resolve the relevant interpretive question. Therefore, we must consider the statute's context.

In our view, the term "audiology services" in 20 U.S.C. § 1401(26)(A) does not unambiguously encompass mapping of cochlear implants. Therefore, Appellants cannot prevail under *Chevron* step one.

**D. The Mapping Regulations Embody a Permissible Construction of the IDEA**

Having determined that the IDEA is ambiguous with respect to whether schools must provide mapping, we proceed to *Chevron* step two to ask "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. At step two, we focus on "whether the [agency] has reasonably explained how the permissible interpretation it chose is 'rationally related to the goals of' the statute." *Village of Barrington, Ill.*, 636 F.3d at 665 (citation omitted); *see also Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) ("A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made . . . ." (citations omitted)); *Bell Atl. Tel. Cos.*, 131 F.3d at 1049 ("[W]e will defer to the [agency's] interpretation if it is reasonable and consistent with the statutory purpose and legislative history." (citations omitted)). As noted above, in order for Appellants to prevail on their *Chevron* step-two claim, we must find that the Mapping Regulations are "manifestly contrary to the statute." *Chevron*, 467 U.S. at 844 (citations omitted). We can make no such finding on the record in this case.

The Department justified the Mapping Regulations based on a number of related considerations. We think each is rationally

related to the goals of the IDEA and supported by the record.

The Department considered whether schools must provide mapping during the day, on campus, for students to benefit from special education. The Department concluded that this was not necessary:

> Although the cochlear implant must be properly mapped in order for the child to hear well in school, the mapping does not have to be done in school or during the school day in order for it to be effective. . . . [Mapping] services and costs are incidental to a particular course of treatment chosen by the child's parents to maximize the child's functioning, and are not necessary to ensure that the child is provided access to education, regardless of the child's disability, including maintaining health and safety while in school.

Final Regulations, 71 Fed. Reg. at 46,569–70.

The Department was entitled to consider the fact that mapping need not take place at school or during school hours to be effective. Appellants do not dispute the proposition that, so long as a student's cochlear implant is routinely mapped *somewhere*, that student will benefit from special instruction. This concession is significant at *Chevron* step two, because the Supreme Court has repeatedly interpreted the "related services" provision by reference to services that must be provided in order to get students to, or keep students in, school. For example, in *Garret F.*, the Court summarized the provision as generally encompassing "services that enable a disabled child to remain in school during the day," because such services "provide the student with 'the meaningful access to education that Congress envisioned.'" 526 U.S. at 73 (citation omitted). And in *Tatro*, the Court was even clearer in stating that "if a particular medication or treatment may appropriately be administered to a handicapped child other than during the school day, a school is not required to provide nursing services to administer it." 468

U.S. at 894.

Appellants counter that in the preamble to its final regulations, the Department acknowledged that "allow[ing] a child to sit in a classroom when the child's hearing aid or cochlear implant is not functioning is to effectively exclude the child from receiving an appropriate education." Final Regulations, 71 Fed. Reg. at 46,571. But Appellants take this statement out of context. The Department made this point to explain why schools are responsible under section 300.113 for the routine checking of the *external* components of cochlear implants – *i.e.*, for checking that the device is turned on, that the settings are correct, and that the cable is connected – but not for mapping the implant.

Appellants also argue that we should not push *Garret F.* and *Tatro* so far as to allow the Department to limit schools' obligations under the "related services" provision to those services that must be offered during school hours. They claim that with such broad authority the Department could functionally write many of the listed services out of the IDEA. Their concern is overstated. As *Garret F.* and *Tatro* demonstrate, there are certain services – continuous nursing services for ventilator-dependent students and clean intermittent catheterization – that absolutely *must* be provided during school hours. *See* 526 U.S. at 69–73; 468 U.S. at 890–91. This conclusion is buttressed by the administrative record here, which illustrates that even certain audiology services *must* be provided during the day – *i.e.*, checking the batteries, settings, and cables of cochlear implants. Furthermore, the Department has not said that school districts are categorically excused from providing other services whenever those services could be provided outside of school hours, so we have no reason to address this issue. Should the Department take this position in the future, affected parties will be free to challenge it.

In promulgating the Mapping Regulations, the Department also considered the technical expertise required to map cochlear implants. *See* Final Regulations, 71 Fed. Reg. at 46,571 ("[T]he distinguishing factor between those services that are not covered under the Act, such as mapping, and those that are covered, such as verifying that a cochlear implant is functioning properly, in large measure, is the level of expertise required."). The agency noted that "[o]ptimization services," such as mapping, "are generally provided at a specialized clinic." *Id.* at 46,570. Moreover, the agency described that "[t]he maintenance and monitoring of surgically implanted devices require the expertise of a licensed physician or an individual with specialized technical expertise beyond that typically available from school personnel." *Id.* at 46,571. Indeed, the American Academy of Audiology informed the Department that it will not even let a candidate sit for its Board Certification examination without two years of experience, 450 hours of contact with individuals with cochlear implants, and fifty hours of case management experience. *See* Academy Letter, J.A. 43.

Thus, the Department concluded that mapping is distinct from the routine checking of acoustical hearing aids and of the external components of a cochlear implant, both of which can be performed by trained lay persons, teachers, and school nurses. Final Regulations, 71 Fed. Reg. at 46,571. The Department was also clearly aware of the fact that – due in part to the expertise required to map a cochlear implant and in part to the cost of equipment and software – mapping imposes a substantial financial burden on school systems. *See, e.g.*, Neault Letter, J.A. 48; Academy Letter, J.A. 44.

These considerations – expertise and cost – are rationally related to the IDEA's purpose. This proposition emerges clearly from the Supreme Court's interpretation of the "medical services" component of the "related services" provision in

*Garret F.* and *Tatro*. Schools are required to provide "medical services, except that such medical services shall be for diagnostic and evaluation purposes only." 20 U.S.C. § 1401(26)(A). In other words, certain medical services are excluded from coverage. To clarify what services are excluded, the Department adopted regulations in 1983 that, *inter alia*, define "medical services" as "services provided by a licensed physician." *Tatro*, 468 U.S. at 892 (citation omitted) (internal quotation marks omitted); *see also* 34 C.F.R. § 300.13(b)(4) (1983). In *Tatro*, the Court held that clean intermittent catheterization – which clearly qualified as a related service – was not excluded as a "medical service," noting that it could be provided by nurses, rather than by licensed physicians. In reaching this holding, the Court explained that the Department's interpretation of "medical services" was "a reasonable interpretation of congressional intent." 468 U.S. at 892. The Court continued: "[T]he Secretary could reasonably have concluded that [the "medical services" exclusion] was designed to spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence." *Id.* The Court reaffirmed this holding in *Garret F*. *See* 526 U.S. at 74 ("[In *Tatro*, w]e referenced the likely cost of the services and the competence of school staff as justifications for drawing a line between physician and other services, but our endorsement of that line was unmistakable." (citation omitted)); *see also id.* at 77 (explaining that Department was entitled to "[d]efin[e] 'related services' in a manner that *accommodates* the cost concerns Congress may have had").

Appellants argue that while the Department was entitled to take cost and expertise into account when interpreting "medical services," it may not do so in interpreting "audiology services." Appellants' Br. at 44. They reach this conclusion based on two premises: First, Congress clearly intended "to include some medical services (those services 'for diagnostic and evaluation

purposes') and exclude others (notably, medical treatments)," *id.*; and, second, "Congress did not restrict coverage of 'audiology services' in the same way," *id.* Based on these premises, Appellants conclude, "there is no statutory basis for inferring that Congress intended to exclude some 'audiology services,' much less that it intended to differentiate between audiology services based on the degree of expertise required." *Id.* But this is nothing more than a repackaged version of Appellants' *Chevron* step-one argument. We have already explained that there *is* a statutory basis for inferring that Congress intended to exclude some audiology services. Starting from that baseline, the Department was clearly entitled to consider cost and expertise in determining which services to include.

Appellants are correct to point out that in enacting the IDEA, "Congress plainly required schools to hire various specially trained personnel to help handicapped children, such as 'trained occupational therapists, speech therapists, psychologists, social workers and other appropriately trained personnel.'" *Tatro*, 468 U.S. at 893 (citation omitted). But we do not believe that the Mapping Regulations are inconsistent with that intent. Even under the Regulations, schools may still be required, pursuant to a child's IEP, to train personnel to perform routine monitoring of the external components of cochlear implants and acoustical hearing aids as well as to hire or retain specialists to provide other supportive audiology services "such as speech and language therapy, assistive listening devices, appropriate classroom acoustics, auditory training, educational interpreters, cued speech transliterators, and specialized instruction." Final Regulations, 71 Fed. Reg. at 46,570. Thus, we think that the Mapping Regulations satisfy the IDEA's educational purpose.

Appellants separately argue that the Mapping Regulations fail at *Chevron* step two, because the Department made an error

in tracking the IDEA's legislative history. When Congress considered the Individuals with Disabilities Education Improvement Act, the Senate Committee initially proposed amending the "related services" and "assistive technology device" provisions to exclude "a medical device that is surgically implanted, [*and*] *the post-surgical maintenance*, *programming*, [and] replacement of such device, [and] an external device connected with the use of a surgically implanted medical device." S. REP. NO. 108-185, at 8 (2003) (emphasis added); *see also id.* at 102, 107. Congress ultimately enacted a narrower amendment, excluding only "a medical device that is surgically implanted, [and] the replacement of such device." 20 U.S.C. § 1401(26)(B), (1)(B). Yet, surprisingly, the Department explained that the Mapping Regulations "reflect[ed] the language in the Senate Report (S. Rpt.) No. 108-185, p. 8, which states that the Senate committee did not intend that mapping a cochlear implant, or even the costs associated with mapping . . . be the responsibility of a school district." Final Regulations, 71 Fed. Reg. at 46,569–70. Appellants, on the other hand, contend that the drafting history demonstrates Congress's intent that mapping be considered a related service and that the Department relied on an obsolete committee report to contravene that intent.

At the outset, we agree with Appellants that the Department's citation of the Senate Report in the preamble to the rulemaking is inexplicable. The Senate Report is based on legislative language that was withdrawn from the final bill. It is incontrovertible, therefore, that the Report is not persuasive or even relevant authority. We think the most plausible explanation is that the Department simply made a mistake in citing the Report. The Department's efforts to explain why the citation was proper, *see* Appellees' Br. at 40–42, are specious at best.

Be that as it may, however, Appellants' legislative history argument has only limited traction. Appellants suggest that the Department's misconstruction of the legislative history should change our analysis at *Chevron* step two. This argument is entirely unpersuasive. The Department's mistake in this instance does not, without more, discredit the Department's judgment in adopting the Mapping Regulations. Nor does the mistake, without more, show that the Department's Mapping Regulations are flawed for want of reasoned decision making. The record here clearly demonstrates that the Department did not rely solely – or even much at all – on the Senate Report in promulgating the Mapping Regulations. Indeed, we have already discussed the various, valid policy considerations that informed the Department's rulemaking.

Appellants also argue that the actual legislative history of the 2004 amendments to the IDEA should be dispositive at *Chevron* step two, because it reveals that the Mapping Regulations are contrary to Congress's intent. But that reasoning is simply incorrect as a matter of law. Unenacted statutory text certainly *may* inform an agency's interpretation of an ambiguous term. This court reiterated that proposition recently in *Village of Barrington*:

> [Intervenor] dismisses the relevance of this legislative history, stating that inferences of legislative intent from unenacted legislation are unreliable. [Intervenor's] caution is well taken, but only to a point. Although we would be uncomfortable relying on such legislative history at *Chevron* step one, we think it may appropriately guide an agency in interpreting an ambiguous statute – just how the Board used it here.

636 F.3d at 666 (citation omitted) (internal quotation marks omitted). Appellants are urging the inverse proposition, however – *i.e.*, that an agency frustrates Congress's intent by not attaching dispositive weight to an inference that can be drawn

from unenacted text. And we are aware of no authority supporting that approach to statutory interpretation. *See Edison Electric Inst. v. EPA*, 2 F.3d 438, 451 (D.C. Cir. 1993) (per curiam) ("[W]e need only note that the deletion of a word or phrase in the throes of the legislative process does not ordinarily constitute, without more, evidence of a specific legislative intent." (citations omitted)).

Finally, we note that prior to the 2004 amendments to the IDEA, several courts had interpreted the Act – as implemented by the Department's then-existing regulations – to require schools to offer mapping, pursuant to children's IEPs. *See, e.g.*, *A.U., ex rel. N.U.*, 501 F. Supp. 2d at 1143–44; *Beth P.*, 2003 WL 260728, at \*4–5. But these decisions do not render the Department's construction of the IDEA impermissible. The Supreme Court confronted a comparable situation in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005). There, the Court explained that when an agency adopts an interpretation of a statute that conflicts with a prior, otherwise controlling court decision interpreting the same statute, the judicial decision "trumps . . . only if [it] holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. This proposition "follows from *Chevron* itself." *Id.* And here, none of the pre-2004 decisions dealing with mapping under the IDEA are binding in this Circuit, and none held that the Act is unambiguous with respect to mapping. Thus, none of those decisions can "trump" the agency's construction of the statute.

In sum, in promulgating the Mapping Regulations, the Department considered whether mapping was necessary for students to benefit from their education; whether mapping had to be provided during school hours, at a school campus; whether mapping could be provided by laypersons, teachers, and other trained educational professionals; and whether mapping imposed

an excessive financial burden on schools. These considerations are rationally related to the purposes of the IDEA. Therefore, the Mapping Regulations are entitled to our deference.

**E. The Mapping Regulations Do Not Violate Section 1406(b)(2) of the IDEA**

Appellants' final claim in this case is that the Mapping Regulations are invalid, because they substantively lessen the protections afforded children with disabilities under the Department's 1983 regulations. As noted above, the IDEA states that

> [t]he Secretary may not implement, or publish in final form, any regulation prescribed pursuant to this chapter that . . . procedurally or substantively lessens the protections provided to children with disabilities under this chapter, as embodied in regulations in effect on July 20, 1983 (particularly as such protections related to . . . related services . . .), except to the extent that such regulation reflects the clear and unequivocal intent of Congress in legislation.

20 U.S.C. § 1406(b)(2). Appellants claim that the Mapping Regulations violate this statutory limitation, because the Department's 1983 regulations unambiguously provided for mapping. The Department counters that the 1983 regulations are ambiguous with respect to mapping. We agree with the Department.

Because the Department has never previously interpreted the 1983 regulations with respect to the question of mapping, "[o]ur task is not to decide which among several competing interpretations best serves the regulatory purpose." *Thomas Jefferson Univ.*, 512 U.S. at 512. Instead, we must give the Department's interpretation of its own regulation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* (citation omitted) (internal quotation marks

omitted). With that standard in mind, we turn to the 1983 regulations.

Those regulations define "related services" to mean

transportation and such developmental, corrective, and other supportive services as are required to assist a handicapped child to benefit from special education, and includes speech pathology and audiology, psychological services, physical and occupational therapy, recreation, early identification and assessment of disabilities in children, counseling services, and medical services for diagnostic or evaluation purposes. The term also includes school health services, social work services in schools, and parent counseling and training.

34 C.F.R. § 300.13(a) (1983).

The regulations then offer a laundry-list definition of "Audiology":

"Audiology" includes:

(i) Identification of children with hearing loss;

(ii) Determination of the range, nature, and degree of hearing loss, including referral for medical or other professional attention for the habilitation of hearing;

(iii) Provision of habilitative activities, such as language habilitation, auditory training, speech reading (lip-reading), hearing evaluation, and speech conservation;

(iv) Creation and administration of programs for prevention of hearing loss;

(v) Counseling and guidance of pupils, parents, and teachers regarding hearing loss; and

(vi) Determination of the child's need for group and

individual amplification, selecting and fitting an appropriate aid, and evaluating the effectiveness of amplification.

*Id.* § 300.13(b)(1).

Appellants argue, first, that the 1983 regulations unambiguously encompass mapping, because the ordinary meaning of "audiology" encompasses mapping. But, as Appellants admit, this is the same argument that they advance at *Chevron* step one. *See* Appellants' Br. at 49. We think that the term "audiology" as used in the 1983 regulations has no more of a fixed meaning than it does in the IDEA itself. Appellants also argue that, prior to 2004, a few district courts interpreted the IDEA and the Department's 1983 regulations to encompass mapping. But it does not matter that some pre-2004 decisions support Appellants' position, because there is no binding authority establishing that mapping unambiguously falls within "audiology" as used by the Department's 1983 regulations. *See Brand X*, 545 U.S. at 982 (holding that a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion").

Appellants finally argue that mapping falls within the Department's 1983 regulations, because those regulations list specific services that "supplement the ordinary meaning of 'audiology.'" Appellants' Br. at 50. As support for this proposition, Appellants emphasize that the 1983 regulations set forth that audiology "*includes*" a series of disparate services. This court has held that when a term is defined by what it "includes" as opposed to what it "means," the term should be interpreted to encompass not just its ordinary meanings but also the specific enumerated examples. *Schumann v. Comm'r of Internal Revenue*, 857 F.2d 808, 811 (D.C. Cir. 1988).

Appellants then argue that mapping is covered under the 1983 regulations as "[d]etermination of the range, nature, and degree of hearing loss," 34 C.F.R. § 300.13(b)(1)(ii) (1983); or "selecting and fitting an appropriate aid," *id.* § 300.13(b)(1)(vi).

This avenue of argumentation fails, because it ignores the deference that is owed to the Department's interpretation of its own regulations. The Department has interpreted the 1983 regulations not to encompass mapping. And to overcome the deference that we owe the Department's construction of its own regulation, Appellants must show that the Department's construction was clearly inconsistent with the regulation. *See Thomas Jefferson Univ.*, 512 U.S. at 512. We think Appellants' efforts to bootstrap mapping awkwardly into these regulatory examples do not satisfy that standard.

In sum, we conclude that the Mapping Regulations do not substantively lessen the protections that were provided to children with disabilities by the 1983 regulations. The Department has interpreted those regulations as not providing cochlear implant mapping, and Appellants have failed to show that the Department's interpretation is plainly erroneous or inconsistent with the regulation.

### III.   Conclusion

For the foregoing reasons, the District Court's grant of summary judgment to the Department is affirmed.

*It is so ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in the judgment:

While I join my colleagues in the judgment affirming the district court, I write separately to set out why I find the result troubling. The principal question before us is whether cochlear implant mapping—i.e., calibrating a cochlear implant so that an individual with profound hearing loss can receive and interpret auditory signals—is an "audiology service[]" or other "related service[]" that must be provided under the IDEA. *See* 20 U.S.C. § 1401(26)(A). This, as my colleagues correctly note, is a "close question." Majority Op. at 19.[1] That said, I agree with them that the "meaning of 'audiology services' as used in the IDEA's 'related services' provision is ambiguous as to whether it encompasses the full panoply of services that might be described as audiology services in other contexts," *id.* at 24, and that the Department's exclusion of mapping is a permissible interpretation of the statutory text, *id.* at 28. Nevertheless, that interpretation is far from satisfactory.

First, although the Department reads the Mapping Regulations as written to exclude cochlear implant mapping from the services a school district must provide under the IDEA, the convoluted (and often contradictory) text of the provisions can be fairly read to say the opposite: that is, a school district must provide cochlear implant mapping. Let's begin with 30 C.F.R. § 300.34, the first of the two challenged Mapping Regulations. It provides an exception to the definition of "related services" that, at first blush, plainly excludes mapping: "Related services *do not include* a medical

---

[1]  It is particularly close in light of both the definition of audiology—"[t]he study of hearing disorders . . . as well as the *rehabilitation of persons with hearing impairments*," STEDMAN'S MEDICAL DICTIONARY 169 (27th ed. 2000) (emphasis added)—and the legislative history of the 2004 amendments to the IDEA, *see* Majority Op. at 34–37.

device that is surgically implanted, *the optimization of that device's functioning (e.g., mapping)*, maintenance of that device, or the replacement of that device." *Id.* § 300.34(b)(1) (emphases added). But, as is often the case with agency regulations, the next paragraph of that section—paragraph (b)(2)—contains an exception to the exception: "Nothing in paragraph b(1) of this section . . . [p]revents the routine checking of an external component of a surgically implanted device to make sure it is functioning properly, as required in § 300.113(b)." *Id.* § 300.34(b)(2). Section 300.34 thus directs us to the second of the two challenged Mapping Regulations—34 C.F.R. § 300.113—to determine whether mapping constitutes the "routine checking of an external component . . . to make sure it is functioning properly."

Following this regulatory bread trail, however, reveals very little. Paragraph (b)(1) of section 300.113 provides that "each public agency must ensure that the external components of surgically implanted medical devices are functioning properly." 34 C.F.R. § 300.113(b)(1). Because mapping ensures that the auditory processor (the external component) of the implant is calibrated so as to send the proper electric signals to the brain, *see* Pls.' Compl. ¶22,[2] and because mapping is necessary for a cochlear implant to function

---

[2] To map the implant, the audiologist connects the child's "microprocessor based speech processor"—the externally worn microprocessor—to a computer that uses special software to measure electrode characteristics and adjust the parameters controlling the stimuli that are delivered to the electrodes within the implant. The Bionic Human, *Cochlear Implants* 379-385 (Frank E. Johnson et al. eds., 2005). The implant's speech processor is then programmed according to each electrode's characteristics (according to the softest and loudest sounds the child can hear comfortably). *See id.* Once the sound processing parameters for all electrodes have been determined, the computer downloads the information to the implant's speech processor. *See id.*

effectively, *see* Final Regulations, 71 Fed. Reg. 46,540, 46,569–70 (Aug. 14, 2006) ("[T]he cochlear implant must be properly mapped in order for the child to hear well in school."), mapping plainly appears to be part of the "routine checking of an external component" of the cochlear implant.

But paragraph (b)(2) of section 300.113 provides an exception to what must be provided under (b)(1). That paragraph provides that "a public agency is *not responsible* for the *post-surgical* maintenance, *programming*, or replacement of the medical device that has been surgically implanted (*or of the external component of the surgically implanted medical device*)." *Id.* § 300.113(b)(2) (emphases added). Is cochlear mapping "post-surgical" programming of a surgically implanted medical device? In one sense, yes, as it occurs after (i.e., post) surgery. On the other hand, if the word "post-surgical" is to have real meaning, it must provide some limit to the otherwise all-encompassing exclusionary language.[3] After all, *all* maintenance, programming or replacement of a medical device that "*has been* surgically implanted" necessarily occurs after surgery. 34 C.F.R. § 300.113(b)(2) (emphasis added). As we have often explained, judges should hesitate to treat words in a regulation or statute as mere surplusage—words of no consequence. *United States v. Project on Gov't Oversight*, 616 F.3d 544, 561 (D.C. Cir. 2010). Perhaps, then, "post-surgical" refers to the programming that occurs in the hospital immediately after the child's cochlear implant surgery.

In short, after tracking two regulatory provisions, two exceptions and one exception to the exception, it is still unclear whether a school district must provide cochlear

---

[3] A six-year-old child has his tonsils removed and twelve years later he graduates from high school. Is his graduation "post-surgical"? Of course not.

implant mapping under the IDEA. In the end, much of this uncertainty is legally irrelevant because, as my colleagues note, Majority Op. at 18-19, the Department has consistently interpreted the Mapping Regulations to exclude cochlear implant mapping and we generally defer to the Department's interpretation of its own ambiguous regulations. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (agency's interpretation of its own regulation has controlling weight unless it is plainly erroneous or inconsistent with the regulation). The Department, and more importantly, children with disabilities, however, would be well served if the Department were to clarify and simplify its regulatory framework. School districts across the nation must interpret the regulations in order to understand their obligations under the IDEA. It does little to advance the educational goals of the IDEA if the Department produces regulations that resist efforts to understand them.

Second, there is a glaring disparity in the Mapping Regulations. It is simply unfair, as the appellants noted at oral argument, that the IDEA does not provide a child born with a severe auditory disability periodic programming of his cochlear implant but that a child with a more moderate disability is entitled to similar periodic programming of a digital hearing aid. *See* 34 C.F.R. § 300.34(c)(1) ("audiology" includes "[d]etermination of children's needs for group and individual amplification, selecting and fitting an appropriate aid, and evaluating the effectiveness of amplification").[4]

---

[4] Although a cochlear implant does not amplify sound and thus does not fall within this portion of the definition of "audiology," a cochlear implant serves the same function as a hearing aid—namely, it enables its user to hear. And just as a digital hearing aid must be periodically programmed in order to function—periodic programming that *is* provided under the IDEA—a cochlear implant must be periodically programmed, that is, mapped, to "ensure that the external components [microphone and processor] . . . are

"[The] Congress enacted IDEA in 1970 to ensure that *all* children with disabilities are provided a free appropriate public education . . . designed to meet their unique needs," *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2491 (2009) (emphasis added), not only those children with disabilities that are more easily or cheaply corrected. While I cannot say that the Mapping Regulations are *ultra vires* in light of the deference we are duty-bound to afford them,[5] they do not, in my opinion, correctly and fairly implement the IDEA.

---

functioning properly." 34 C.F.R. § 300.113(b)(1). Indeed, the external components are the *only* components whose functioning can be monitored to ensure the implant's efficacy.

[5] As noted by my colleagues, Majority Op. at 23–24, the "related services" exception added to the statute in 2004—20 U.S.C. § 1401(26)(b)—does *not* expressly exclude cochlear implant mapping. The exception plainly states that "related services" excludes the provision and replacement of surgically implanted devices only. 20 U.S.C. § 1401(26)(b) ("related services" "do[] not include a medical device that is surgically implanted, or the replacement of such device"). It says nothing about mapping and ordinarily we would not presume the Congress intended to exclude any service other than those expressly excluded. *See, e.g.*, *Lever Bros. Co. v. Dist. of Columbia*, 204 F.2d 39, 41 (D.C. Cir. 1953) (under canon of *expressio unius est exclusio alterius* "specific exclusion would seem to indicate that [non-listed] factors should be included within the definition").